ATTORNEY-GENERAL, *ex. rel.*, Commissioners of Coos County

*v.*

PAUL MORIN.

*Jean L. Blais* and *Crawford D. Hening* (by brief and orally), for the relators.

*Arthur J. Bergeron* and *Wyman, Starr, Booth, Wadleigh & Langdell* (*Mr. Eliot U. Wyman* orally), for the defendant.

BRANCH, J. Article 37 of the New Hampshire Bill of Rights provides as follows:

"In the government of this state, the three essential powers thereof, to wit, the legislative, executive, and judicial, ought to be kept as separate from, and independent of, each other, as the nature of a free government will admit, or as is consistent with that chain of connection that binds the whole fabric of the constitution in one indissoluble bond of union and amity."

The position of the relators is thus stated in their brief:

"Primarily, judicial power connotes the disposition of litigation according to principles of law or equity, or of statutory rights or liabilities or administration of the criminal law." "The functions of the judges is to determine controversies between litigants. . . . They speak 'the rule or sentence.' *Cardozo*, C. J., *In re Richardson*, 247 N. Y. 401 (1928).

"The legislature therefore acts *ultra vires* when it attempts to impose upon the judicial department duties and powers which are inconsistent with or antagonistic to the exercise of judicial power as meant by Art. 4, Part II; for such imposition is forbidden by Art. 37, of the Bill of Rights."

The soundness of this position must be tested in the light of the principle, which has been frequently stated by this Court, that the language of the Constitution is to be understood in the sense in which it was used when the Constitution was adopted in June, 1784. "We regard it as a well settled and unquestioned rule of construction that the language used by the legislature, in the statutes enacted by them, and that used by the people in the great paramount law which controls the legislature as well as the people, is to be always understood and explained in that sense in which it was used at the time when the constitution and the laws were adopted." *Opinion of the Justices*, 41 N. H. 551; *Ib.* 44 N. H. 633, 635; *State* v. *Griffin*, 66 N. H. 326, 327.

In construing the Constitution, as in the case of any other writing, "it is the duty of the court to place itself as nearly as possible in the situation of the parties at the time the instrument was made, that it may gather their intention from the language used, viewed in the light of the surrounding circumstances." *Weed* v. *Woods*, 71 N. H. 581, 583.

"While the constitution as it now stands is to be considered as a whole as if enacted at one time (*Drew* v. *Tifft*, 79 Minn. 175), to ascertain the meaning of particular expressions it may be necessary to give attention to the circumstances under which they became parts of the instrument." *Thompson* v. *Kidder*, 74 N. H. 89, 91.

Clearly our problem calls upon us "to ascertain the meaning" of the constitutional declaration that "the three essential powers" of the State Government "to wit, the legislative, executive and judicial" ought to be kept separate from each other, and in solving this problem "it may be necessary to give attention to the circumstances under which the foregoing declaration became part of the instrument." *Thompson* v. *Kidder, supra.* If, when read in the light of surrounding circumstances, the meaning of this declaration is not doubtful, then it is to be given effect without further argument, but if the meaning is doubtful, recourse must be had to other evidence to resolve the doubt. "When its meaning is not reasonably and morally certain the contract is not altered for that reason. However inconclusive the evidence, it is to be weighed. However doubtful the intention, a preponderance of probability is enough to establish it." *Smith* v. *Furbish*, 68 N. H. 123, 135.

It cannot be assumed, in the absence of evidence, that "powers . . . judicial" meant to the framers of the Constitution in 1784, the same thing that "the function of the judges" meant to Judge *Cardozo* in 1928. "It often happens, however, that the expressed intention when applied to external objects becomes doubtful and ambiguous; the sense of the language as used in the writing is not clear in the absence of extraneous proof of the sense attached to it by the parties seeking to express their purpose thereby. There exists what is usually denominated a latent ambiguity. That the parties intended to express some purpose is not open to doubt, but in such cases it cannot be practically applied without the aid of extraneous evidence." *Jones* v. *Bennett*, 78 N. H. 224, 230, 231. As pointed out by *Walker*, J., in the same opinion: "Whether there is an ambiguity calling for explanation is clearly a question of fact upon which in a given case different courts might reach different conclusions. And much of the

apparent conflict in the cases is due to the inability of all men to weigh the evidence tending to show an ambiguity in the same way. In *Stevens* v. *Underhill*, 67 N. H. 68, the opinion of the court is based upon the finding that the testator's intent is left in doubt (*p.* 71), while the dissenting opinion proceeds upon a finding that the language of the will is clear, explicit and unambiguous."

In considering the content of the phrase "powers . . . judicial" as used by the framers of the Constitution in 1784, two surrounding circumstances should be noted: 1, the nature of the judicial system prevailing in the Province of New Hampshire during the Colonial period then scarcely ended, and 2, the purpose sought to be accomplished by Article 37 of the Bill of Rights as indicated by contemporary records.

In regard to the first of these considerations, it is abundantly clear that the men of 1784 had lived under a judicial system in which the courts were called upon to exercise a wide variety of functions which were chiefly executive, though sometimes legislative in character. In Colonial times the county courts could abate town taxes for poverty (2 Province Deeds, 183), could levy taxes on towns for court charges and audit the court accounts so that all towns should pay on an equal basis (1 P. D. 100). After 1668, tax equalization was lodged in the Commissioners for Small Claims (appointed by the Court) and two men chosen from the county by the General Court. Colonial Laws of Massachusetts, 239. The county court licensed ferries and controlled the rates of tolls (1 P. D. 141; 2 P. D. 155b). It granted and revoked licenses for the sale of liquor (1 P. D. 267; 2 P. D. 9a). Apprentices were bound out by the county courts (5 P. D. 15, 16, 19). It controlled the building of inter-county highways and issued orders apportioning the expense (1 P. D. 100; 1 P. D. 26; 2 P. D. 8b). The county court made orders for the support of paupers by the towns. Colonial Laws of Massachusetts (1672) 123; 2 P. D. 2. The same court could admit immigrants or deport aliens. Colonial Laws of Massachusetts (1660) 193; *Ib.* (1672) 143; 2 P. D. 151b, 192; 1 P. D. 98, 100; 2 P. D. 60a; 2 P.. D. 202.

By an act passed February 21, 1745, two justices of the peace in any county were empowered to appoint two persons to prosecute violators of the law against killing deer out of season. 3 N. H. Laws, 17. By an act passed March 1, 1758, this duty was transferred to the Court of General Sessions. 3 N. H. Laws, 172. July 26, 1753, the Court of General Sessions was empowered to fix the number of tavern keepers in each town. 3 N. H. Laws, 188. Jan-

uary 10, 1766, the Court of General Sessions was empowered to appoint a jury or committee to report the damages occasioned by a change in a highway.  3 N. H. Laws, 382.  January 16, 1766, the Court of General Sessions was empowered to hear the appeals of persons convicted of violating the act fixing the price of bread. 3 N. H. Laws, 389.

The act of July 5, 1776, "establishing courts of law for the administration of justice within this colony," gave to the newly established courts "like jurisdiction and authority in all matters and causes" as the courts previously existing "respectively held and exercised." 4 N. H. Laws, 34.  December 13, 1776, the Court of General Sessions was empowered to receive and count the votes for county treasurer and recorder of deeds, and in case of a tie, "the choice shall be determined by the votes of the major part of the justices of said court present."  4 N. H. Laws, 63.  The acts of January 18, 1777, and April 10, 1777, gave the courts special authority over cases arising under the act "for regulating the price of sundry articles."  4 N. H. Laws, 78.  April 12, 1777, courts were given special authority to enforce the statute against "desertion of soldiers during the present war with Great Britain."  4 N. H. Laws, 92.  This provision was reënacted June 27, 1782.  4 N. H. Laws, 474.  By the act of June 25, 1777, reënacted June 13, 1780, three justices of the peace were empowered to determine all disputes concerning the maintenance of the poor, subject to appeal to the Superior Court.  4 N. H. Laws, 99.  November 27, 1777, courts were given special power to hear indictments, presentments or special actions on the case for breach of the statute "to prohibit the selling of goods at public vendue." 4 N. H. Laws, 115.  By the acts of December 26, 1778, and March 22, 1782, the Court of General Sessions was empowered to license retailers of spirituous liquors and enforce the terms of the license. 4 N. H. Laws, 199.  April 7, 1781, justices of the peace and courts of record were given special authority to render judgment of forfeiture against persons violating the act "to prevent fraud in shoes for the Army of the United States of America."  4 N. H. Laws, 390. February 28, 1783, the Court of General Sessions was empowered to fix tolls for ferries.  4 N. H. Laws, 503.

Since the founding fathers were familiar with a judicial system in which courts exercised a wide variety of functions, the argument of the plaintiffs that "powers . . . judicial" connoted to their minds exclusively "the determination of controversies between litigants," fails to carry conviction.

With reference to the purpose of Article 37 of the Bill of Rights, it should be remembered that during the Revolution all sorts of executive and many judicial powers had been exercised by the Legislature and this practice had resulted in great dissatisfaction. As illustrative of the sentiment prevailing at about the time when the Constitution was adopted, reference may be made to a series of articles by "The Examiner" published in the New Hampshire Gazette in February and March, 1783, particularly the issue of March 1, 1783, in which the author asserts that the general assembly exercises "all the powers of government; they make laws and appoint persons to judge of and execute them. Every judicial and executive officer of the state and all general and field officers are their servants . . . the members of the committee of safety . . . are their servants. The justices of the several courts . . . are their creatures; and all the executive officers of the state stand indebted to them for their existence — is it possible that Europe or even Asia itself can present a more perfect tyranny?" See also Address of the New Hampshire Constitutional Convention of 1781 to the Inhabitants of the State, pages 5 and 6, reprinted in Colby: Manual of the Constitution of New Hampshire, 95; Letter of Josiah Bartlett to Meshech Weare, dated July 20, 1778, and answer of Weare to Bartlett dated August 8, 1778, 4 Historical Magazine, 331, 332; anonymous pamphlet published in 1791 entitled "Some Remarks on the Proceedings of the Late Convention; With a Few Observations on our Present Government." No evidence has been discovered of any contemporary dissatisfaction over the wide range of duties performed by the courts.

The convention was engaged in setting up new executive and judicial branches of the State Government and it may well have been that the prime purpose of Article 37 in the minds of its framers was to protect these new departments from legislative encroachment rather than to circumscribe within strict limits the functions of the Court. This purpose of Article 37 was vindicated in *Merrill* v. *Sherburne*, 1 N. H. 199, in which the practice of granting new trials by the Legislature was held to be unconstitutional.

Considered in the light of these surrounding circumstances, the precise meaning of Article 37 must be regarded as highly doubtful. "No particular definition of judicial powers is given in the Constitution." *Merrill* v. *Sherburne, supra.* A latent ambiguity as to the meaning of the constitutional provision above quoted must, therefore, be recognized which calls for the consideration of other evidence to elucidate its meaning.

"Great weight has always been attached, and very rightly attached, to contemporaneous expositions." *Marshall*, C. J. in *Cohens* v. *Virginia*, 6 Wheaton 264, 418. The evidence of such contemporary construction goes far toward a settlement of the present controversy. The elaborate argument by which the plaintiffs undertake to demonstrate that "the so-called doctrine of contemporaneous or practical construction of a constitution has no application here," is damaging to the plaintiffs' case because it is in effect, 1, an exhortation to the Court to ignore evidence which it knows to exist, and 2, a tacit admission that this evidence, if considered, must be fatal to the plaintiffs' contention. We cannot close our eyes to the following historical facts.

By an act passed February 9, 1791 (5 N. H. Laws, 638) within seven years after the adoption of the Constitution, it was provided: "That the Justices of Peace in the respective Counties in this State, at any Court of General Sessions of the peace be and hereby are authorized and empowered to make orders for the raising of any sum or sums of money that may be necessary from time to time for building or repairing Court-houses, Prisons, houses of Correction, or other public County-buildings, payment of grand Jurors, travel of petit Jurors, travel and attendance of the Justices of the Sessions, and all other County charges within each County, and to examine or allow any accounts or demands, that may be laid before them, for the ends aforesaid. . . ." It may be argued that many of the specific provisions above set forth had some connection with the necessary judicial functions of the Court of General Sessions, and were therefore properly conferred upon it. They may indeed be defended upon that ground, but the power of raising money for "other county buildings" and for "all other county charges within each county" coupled with the power of auditing all accounts "for the ends aforesaid" had the effect of placing all the financial affairs of a county under the supervision of the Court. This leads to one of two conclusions, either the Legislature of 1791 considered the supervision of county finances to be a proper function or power of a judicial department, or it felt that to confer this power upon the Court was consistent with "that chain of connection that binds the whole fabric of the constitution in one indissoluble bond of union and amity."

If it were necessary to rest our decision solely upon the evidence of contemporary construction furnished by the statute of 1791, the remarks of Judge *Doe* in *State* v. *Company*, 60 N. H. 219, 246, 247, and of Judge *Peaslee* in *Eyers Woolen Company* v. *Gilsum*, 84 N. H. 1, 18,

19, with reference to the danger of accepting the precedents of that period as authorities would require careful attention. We do not, however, find ourselves in that unfortunate situation. Subsequent legislative history confirms our conclusion. Some of the powers conferred upon the Court by the act of 1791 have been withdrawn and others have been added.

In February, 1794, an act was passed "To Abolish the Courts of General Sessions of the Peace and to vest in the Courts of Common Pleas all the Judicial Powers, Authorities and Jurisdiction and all other Powers Except Granting Taxes Heretofore by Law Vested in Said Courts of General Sessions of the Peace." Section 3 of that act, however, required county treasurers to certify annually to the judges of Courts of Common Pleas "a particular statement of such treasury" and required the judges to determine "what monies are in their opinion necessary to be raised in said county for the year ensuing," and these findings were to be reported by the several clerks to the county conventions which were given the power of "granting and appropriating taxes for their county." It was further provided that "said judges shall, from time to time, make orders on the several treasurers in their respective counties for paying out such monies agreeable to appropriations made by such convention." These provisions were continued in force by the Revised Statutes of 1843 and the Compiled Statutes of 1854. By the General Statutes of 1867 it was provided that the county treasurer's statement of the condition of the county treasury should be made to the county commissioners who were required to submit it to the Presiding Justice of the Supreme Court "and they shall recommend to the county convention the sum necessary to be raised for the county for the year ensuing." G. S., c. 22, s. 4. These provisions were continued in force by the General Laws of 1878. By the Public Statutes of 1891 the Court was finally relieved of the duty of estimating the amount of county taxes required for the ensuing years.

By Laws 1843, c. 34, s. 1, it was provided that "whenever the money in the treasury of any county shall be insufficient to meet the demands upon the same the treasurer, upon an order of the Court of Common Pleas may borrow such sum as they shall deem necessary for the purpose and may bind the county for the repayment of the same." The substance of this provision, requiring the approval of the Court for county borrowing and the issuance of county notes, has been in force ever since that time and appears today in R. L., c. 48, ss. 8, 9.

By Laws 1872, *c.* 43, *s.* 1, it was provided that the county convention should appoint two auditors biennially, one from each of the two leading political parties, but by Laws 1897, *c.* 87, *s.* 1, the duty of appointing such auditors was imposed upon the then Supreme Court, and the Court was given discretion as to the times when audits of county accounts should be made.

It thus appears that throughout the history of this State some court has been regarded by the Legislature as the guardian of county finances, and supervision over the financial affairs of the counties in varying degrees has been vested in the Court of General Sessions of the Peace, the Court of Common Pleas, the Supreme Court and the Superior Court.

The statute in question falls clearly within the historical pattern of legislation designed to make effective judicial control over county finances. The constitutionality of such acts has never been contested and it is now too late to assert that the present act is obnoxious to Article 37 of the Bill of Rights. The meaning of the Constitution "is settled by the continuous and uninterrupted interpretation placed upon it for over" one hundred and fifty years. *Canaan* v. *District*, 74 N. H. 517, 540; *Opinion of the Justices*, 76 N. H. 588, 590.

In view of the foregoing discussion, little need be said regarding the subsidiary claim of the plaintiffs that the act is unconstitutional because the provisions of section 4 impliedly grant the power of removal and impose upon the Court the duty of "judicial surveillance of the doings of the fiscal agent." The power of appointment normally includes the power of removal. *Opinion of the Justices*, 90 N. H. 568. Assuming that the plaintiffs' construction of section 4 is correct, it merely gives expression to the foregoing principle of law. In this there is nothing unconstitutional. If the power of appointment is properly conferred, the power of removal cannot be successfully attacked.

The limits of our decision are clearly indicated above. Whether the courts can constitutionally be required to appoint civil officers generally, is a question not now presented or considered. The present decision has reference only to county officers necessary for the fiscal administration of the county treasury.

*Information quashed.*

Marble, C. J., and Johnston, J., dissented: the others concurred.

MARBLE, C. J., *dissenting:* In numerous decisions of comparatively recent date this Court has declared that the admonition of Article 37 of the Bill of Rights concerning the independence of the three essential powers of government must be strictly observed. *Opinion of the Justices,* 85 N. H. 562, 566, 567; *Opinion of the Justices,* 86 N. H. 597, 601; *Opinion of the Justices,* 87 N. H. 492, 493; *Ferretti* v. *Jackson,* 88 N. H. 296, 299.

"Speaking broadly," judicial power is the power "to interpret laws and decide disputes." *Opinion of the Justices,* 85 N. H. 562, 567. It is so defined today and must have been so understood when the Constitution was adopted. *Merrill* v. *Sherburne,* 1 N. H. 199, 203; *Opinion of the Justices,* 86 N. H. 596, 601, 602. Certainly the framers of that instrument, who in Article 4, Part II, set forth with extreme particularity the functions of the courts, could not have used the term in a loose and inaccurate sense.

Where words possess a "customary signification" a definition of them would be useless — " 'powers judicial,' 'judiciary powers,' and 'judicatories' are all phrases used in the constitution: and though not particularly defined, are still so used to designate with clearness, that department of government, which it was intended should interpret and administer the laws." *Woodbury,* J., in *Merrill* v. *Sherburne, supra.*

Lord Bacon's classification of ambiguities as latent and patent has been characterized as "an unprofitable subtlety." Thayer, Preliminary Treatise on Evidence, 424. While language is usually to be interpreted in the light of the circumstances surrounding its utterance, such circumstances cannot be shown for the purpose of contradicting the plain meaning of the language used: "the line of exclusion depends on how far the words will stretch, and how alien is the intent they are asked to include." *Learned Hand,* J., in *Eustis Mining Co.* v. *Beer,* 239 Fed. Rep. 976, 985. To extend the words "judicial power" to include the alien duty of appointing and supervising an official who "shall have all the powers and duties of the county commissioners of Coos county" (Laws 1943, *c.* 117, *s.* 3) is to stretch the words to the breaking point.

"Whether we are considering an agreement between parties, a statute or a constitution, with a view to its interpretation, the thing which we are to seek is, *the thought which it expresses.* To ascertain this, the first resort in all cases is to the natural signification of the words employed, in the order of grammatical arrangement in which the framers of the instrument have placed them. If thus regarded

the words embody a definite meaning, which involves no absurdity, and no contradiction between different parts of the same writing, then that meaning apparent upon the face of the instrument is the one which alone we are at liberty to say was intended to be conveyed. In such a case there is no room for construction. That which the words declare, is the meaning of the instrument; and neither courts nor legislatures have a right to add to or take away from that meaning. This is true of every instrument, but when we are speaking of the most solemn and deliberate of all human writings, those which ordain the fundamental law of states, the rule rises to a very high degree of significance. It must be very plain, nay, absolutely certain, that the people did not intend what the language they have employed, in its natural signification, imports, before a court will feel itself at liberty to depart from the plain reading of a constitutional provision." *Newell* v. *People*, 7 N. Y. 9, 97, cited with approval in Cooley's Constitutional Limitations (7th *ed.*) 91, and in *George* v. *Concord*, 45 N. H. 434, 440.

Since the term "judicial power" is not ambiguous, no resort may be had to "extrinsic evidence of the intent of those who used it." *Franklin Street Society* v. *Manchester*, 60 N. H. 342, 349. In the case of *Jones* v. *Bennett*, 78 N. H. 224, 231, cited in the majority opinion, it is stated that "such evidence is admissible as a matter of necessity to prevent a finding of indefiniteness and a consequent failure to give any effect to the language" employed, but that "when no ambiguity exists as to the sense in which" the language is used, "proof by extraneous evidence" that it is used "in a peculiar or unusual sense, would be to contradict and defeat" the expressed intent.

This being the correct rule, it follows that neither pre-constitutional usage nor post-constitutional enactments can be invoked to prove that the framers of the Constitution considered the supervision of county affairs to be a judicial duty. To attach significance to the pre-constitutional practice of delegating executive powers to the judiciary is to disregard the constitutional purpose of abolishing these practices, and to assign importance to post-constitutional legislation is to ignore the discussions in the cases of *State* v. *Company*, 60 N. H. 219, 246, 247, and *Eyers Woolen Co.* v. *Gilsum*, 84 N. H. 1, 18, 19.

The fact that these early enactments have never been assailed does not tend to establish their validity. In *State* v. *Company, supra*, Judge *Doe*, citing *Pierce* v. *State*, 13 N. H. 536, 557, 558, has said that we cannot look with confidence "to the period immediately

succeeding the Revolution for judicial precedents," that the people, "few in number, recovering laboriously from the effects of the war, concerned themselves with practical results," that they had "little leisure for seeking grievances in mere formal defects of their own legislation," that they were "largely controlled in their views of public affairs by their pre-constitutional usages" and "were satisfied with customary modes" that "did not appear to them substantially inequitable." In *Eyers Woolen Co.* v. *Gilsum, supra,* Judge *Peaslee* has declared that the legislation of this period as a whole "reveals what today seems to be an amazing disregard of the plainest principles."

That the term "judicial power" meant the same to the framers of the Constitution as it means to us today is, as already suggested, definitely shown by Article 4, Part II, of that instrument, which provides that the Legislature shall have authority to establish courts of record "for the hearing, trying, and determining, all manner of crimes, offenses, pleas, processes, plaints, actions, causes, matters and things whatsoever, arising or happening within this state, or between or concerning persons inhabiting or residing, or brought within the same, whether the same be criminal or civil, or whether the crimes be capital, or not capital, and whether the said pleas be real, personal, or mixed; and for the awarding and issuing execution thereon." The phrase "matters and things whatsoever" has reference of course to matters and things of the same general character as those specifically enumerated. *Davis* v. *Company,* 88 N. H. 204, 209, and cases cited.

It is significant that these enumerated duties do not include expressly or by reasonable implication any such duties as those which the Superior Court is directed by Laws 1943, *c.* 117, to assume.

It is true of course that the three essential powers of government cannot be completely separated. "In the nature of things there must be some overlapping." *Opinion of the Justices,* 85 N. H. 562, 567. And just as executive officers may be vested with some judicial power in order to accomplish properly the purpose for which their offices have been created (*Opinion of the Justices,* 87 N. H. 492, 493), so may judges be vested with some administrative power if, but only if, that power is needed to enable them to perform their judicial duties. *Opinion of the Justices,* 85 N. H. 562, 567, 568. There is nothing in the fiscal agent act to warrant the assumption that the County of Coos is in so desperate a plight that the Superior Court must intervene in order to preserve property essential to the efficient

administration of justice. No judicial duty is required of the Court by the act. Appointment of a fiscal agent and supervision of his activities are purely administrative tasks, and these tasks, as plaintiffs' counsel so clearly point out, render no conceivable aid to any judicial function.

Nor is the situation the equivalent of a receivership. "A receiver is an indifferent person between the parties to a cause, appointed by the court to receive and preserve the property or fund in litigation *pendente lite,* when it does not seem reasonable to the Court that either party should hold it." High, Receivers (4th *ed.*), *s.* 1. The necessity for a receivership and the extent of its duration are matters for the determination of the Court. *Ib., ss.* 7, 820; *Eastman* v. *Bank,* 58 N. H. 421, 422. The act in question gives the Court no choice in these matters. It directs the Court to appoint the agent. The provisions of the act are to be effective for two years. At the end of the first year the voters of the county are to express their approval or disapproval "of having the legislature extend the provisions of the law," and "the result of the voting on said question" is to be reported to the Legislature of 1945.

In my opinion chapter 117 of the Laws of 1943 is unconstitutional.

JOHNSTON, J., concurred in the foregoing opinion.