Merrimack
No. 92-509

CALVIN WARBURTON & a.

v.

GEORGIE A. THOMAS & a.

HAROLD W. BURNS & a.

v.

JOHN P. ARNOLD, ATTORNEY GENERAL

November 20, 1992

*Douglas & Douglas*, of Concord (*Charles G. Douglas, III* on the brief and orally), for Calvin Warburton & a.

*Orr and Reno, P.A.* and *Upton, Sanders & Smith*, of Concord (*William L. Chapman* and *Richard F. Upton* on the brief and orally), for Harold W. Burns & a.

*John P. Arnold*, attorney general (*George Dana Bisbee*, deputy attorney general, on the brief and orally), for John P. Arnold, Attorney General.

BROCK, C.J. This consolidated interlocutory transfer without ruling from the Superior Court (*Manias*, J.) involves two constitu-

tional issues, which were first raised below in separate petitions for declaratory judgment. The parties seek rulings on the constitutionality of the passage of House Bill 1026 by the legislature over a gubernatorial veto and on the constitutionality of the bill itself.

The first action, *Warburton v. Thomas*, involves an interpretation of part II, article 44 of the New Hampshire Constitution. The question presented for review is whether the long-standing practice of the New Hampshire House of Representatives requiring a vote of two-thirds of the representatives present and voting, a quorum being present, meets the requirement of part II, article 44 that a vote of "two-thirds of that house" is necessary to override a veto.

The second action, *Burns v. Attorney General*, involves the interpretation of part II, article 18-a of the New Hampshire Constitution. The question presented for review is whether House Bill 1026 is a budget bill and, therefore, violates article 18-a because it contains provisions which establish, amend, or repeal non-budgetary statutory law.

## I. Background

The *Warburton* plaintiffs are house member Calvin Warburton; senate members Thomas Colantuono, Roger Heath, Sheila Roberge, Eleanor Podles, Gordon Humphrey, and James R. St. Jean; and Charles G. Douglas, III, a private citizen. The defendants are State Treasurer Georgie A. Thomas, Secretary of State William M. Gardner, and the State of New Hampshire. Harold W. Burns, Caroline L. Gross, and Mary P. Chambers intervened as defendants in *Warburton* and are the speaker, majority leader, and minority leader, respectively, of the house of representatives. In *Burns*, the plaintiffs are the same intervenors above, and the defendant is State Attorney General John P. Arnold.

House Bill 1026, "an act relative to a companion bill to the supplemental budget," originally was introduced in the house on February 27, 1992. It established a committee to examine compliance with part II, article 6-a of the New Hampshire Constitution. The house passed HB 1026 on March 5, 1992, and sent it to the senate. On March 26, 1992, the senate passed its substantially amended version of HB 1026. On April 2, 1992, the house appropriations committee held a special public hearing on the senate amendments to HB 1026. Thereafter, the house nonconcurred with the senate amendments and requested a committee of conference. The senate agreed to the request, and HB 1026 was reviewed by a committee of conference, which included sessions open to the public.

The committee of conference issued its report on May 4, 1992, proposing amendments to HB 1026. On May 6, 1992, the report was adopted by the senate but rejected by the house. The house then voted to discharge the first committee of conference and to request a new conference committee. The senate acceded, and HB 1026 was taken up by a second committee of conference, including public sessions.

The second committee of conference issued a report on May 7, 1992, proposing amendments to HB 1026. The report was adopted by both the house and the senate in May 1992. HB 1026, as passed by the legislature, contains provisions which appropriate approximately $13,000,000, as well as provisions which establish, amend, or repeal statutory law.

On June 3, 1992, the Governor vetoed HB 1026. On June 17, 1992, there were 395 elected members of the house. Only 347 members, however, were present and voting on that day. After a quorum was declared present, the house voted 247 to 100 to override the Governor's veto. Plaintiff Warburton voted against the veto override in the house. After the vote, the speaker declared that "the bill passed by the necessary two-thirds."

Thereafter, the senate, which consisted of 24 elected members, voted 17 to 6 to override the Governor's veto. Plaintiffs Colantuono, Heath, Roberge, Podles, Humphrey, and St. Jean voted against the veto override in the senate.

## II. Warburton v. Thomas

The Warburton plaintiffs challenge the long-standing veto override practice of the house. They argue that part II, article 44 of our constitution requires a vote of two-thirds of the entire house membership, rather than two-thirds of those present and voting, to override a gubernatorial veto. The plaintiffs therefore contend that the house vote, taken on June 17, 1992, did not comport with part II, article 44, because less than two-thirds of the entire house voted in favor of the bill. In response, intervenors Burns, Gross, and Chambers (house leaders) argue that the veto override practice of the house does not run afoul of part II, article 44, which, they argue, requires the assent of only two-thirds of the house members present and voting to override a gubernatorial veto.

### A. Constitutional Construction

■■ The legal principles involved in constitutional interpretation are well-established. In construing a provision of the constitu-

tion, we must look to its purpose and intent. *See N.H. Munic. Trust Workers' Comp. Fund v. Flynn, Comm'r*, 133 N.H. 17, 21, 573 A.2d 439, 441 (1990); *Opinion of the Justices*, 126 N.H. 490, 495, 494 A.2d 261, 267 (1985). Reviewing the history of the constitution and its amendments is often instructive, and in so doing,

> "it is the duty of the court to place itself as nearly as possible in the situation of the parties at the time the instrument was made, that it may gather their intention from the language used, viewed in the light of the surrounding circumstances.
>
> While the constitution as it now stands is to be considered as a whole as if enacted at one time, to ascertain the meaning of particular expressions, it may be necessary to give attention to the circumstances under which they became parts of the instrument."

*Attorney-General v. Morin*, 93 N.H. 40, 43, 35 A.2d 513, 514 (1943) (quotations and citations omitted); *see also Opinion of the Justices*, 126 N.H. at 495, 494 A.2d at 266.

For example, we have twice been asked by the house of representatives whether the legislature had the power to change the law to allow petit juries numbering less than twelve persons. *See Opinion of the Justices*, 121 N.H. 480, 483, 431 A.2d 135, 136 (1981); *Opinion of the Justices*, 41 N.H. 550, 551 (1860). We examined the meaning of the terms "jury" and "trial by jury" at the time of the adoption of our constitution and concluded that a jury of less than twelve persons was unknown at that time. *Opinion of the Justices*, 121 N.H. at 483, 431 A.2d at 136; *Opinion of the Justices*, 41 N.H. at 551. Thus, we opined that a jury of less than twelve persons would be unconstitutional. As for rules governing construction, we said:

> "'[W]e regard it as a well settled and unquestioned rule of construction that the language used by the legislature, in the statutes enacted by them, and that used by the people in the great paramount law which controls the legislature as well as the people, is to be always understood and explained *in that sense in which it was used at the time when the constitution and the laws were adopted.*'"

*Opinion of the Justices*, 121 N.H. at 483, 431 A.2d at 136 (emphasis added in 121 N.H. at 483, 431 A.2d at 136) (quoting *Opinion of the Justices*, 41 N.H. at 551).

## B. Constitutional History

The *Warburton* issue calls upon us to ascertain the meaning of the provision of part II, article 44, requiring approval by "two-thirds of that house" in order to override a gubernatorial veto. In its entirety, article 44 states:

> "[Art.] 44. [Veto to Bills.] Every bill which shall have passed both houses of the general court, shall, before it becomes a law, be presented to the governor, if he approve, he shall sign it, but if not, he shall return it, with his objections, to that house in which it shall have originated, who shall enter the objections at large on their journal, and proceed to reconsider it; if after such reconsideration, two-thirds of that house shall agree to pass the bill, it shall be sent, together with such objections, to the other house, by which it shall likewise be reconsidered, and, if approved by two-thirds of that house, it shall become a law. But in all such cases the votes of both houses shall be determined by yeas and nays, and the names of persons, voting for or against the bill, shall be entered on the journal of each house respectively. If any bill shall not be returned by the governor within five days (Sundays excepted) after it shall have been presented to him, the same shall be a law in like manner as if he had signed it unless the legislature, by their adjournment, prevent its return, in which case it shall not be a law."

To determine the meaning of the phrase "two-thirds of that house," we examine the history that led to the adoption of article 44. New Hampshire adopted its first constitution in 1776 after the State became independent of British rule. This constitution, which was a temporary document, centered all the governing power in the legislature. *See* L. ANDERSON, TO THIS DAY 64–65 (1981). It provided for no governor or other executive officer, and the judiciary was given no independence. *See* Richard F. Upton, The Constitution of 1776 From the Viewpoint of the Legislative Branch, Address at the Commemoration of the Adoption of New Hampshire's First State Constitution, at 25 (Jan. 5, 1976) (transcript available in New Hampshire Supreme Court Library). Because this constitution vested no power in a governor, it did not contemplate a gubernatorial veto. The centralization of power in the legislature reflected the framers' distrust of the unchecked power of the royal governors under England's rule. *See* Upton, *supra* at 26–27. This temporary constitution continued in force until 1784, when the current New Hampshire Constitution became effective. *See* ANDERSON, *supra* at 82-83.

The voters rejected revisions to the constitution proposed in 1781 and 1782. "[T]he proposals included a bill of rights, an independent judiciary and a governor and council as executive with the governor having a qualified veto of legislation." Upton, *supra* at 27. The 1781 and 1782 drafts contained identical veto provisions that were modeled after the Massachusetts Constitution. *See* Upton, *supra* at 27. Under these drafts, if the governor vetoed a bill, he was to send it back to the originating house for reconsideration. Thereafter, if

> "three quarters of [the originating house], shall . . . agree to pass the same, it shall . . . be sent to the other branch of the Legislature, where it shall be also reconsidered, and if approved by three quarters of the members present, it shall have the force of a law."

N.H. CONST. pt. II (proposed 1781 and 1782). The voters rejected this proposal, at least in part because it vested too much power in the executive. *See* Upton *supra*.

In 1784, the voters adopted a permanent constitution that "contained a Bill of Rights, safeguarding the individual freedoms and the privacy of homes." ANDERSON, *supra* at 83. The bill of rights was borrowed in great detail from the Massachusetts Constitution. The permanent constitution also launched the concept of a tripartite system of government made up of the legislative, executive, and judicial branches. ANDERSON *supra*. Still fearing "dictatorial and self-serving royal Governors," the drafters of the 1784 constitution did not provide for a strong governor. ANDERSON, *supra* at 82. Instead they vested limited executive powers in a president, who had no veto whatsoever, and whose main responsibility was to preside over the senate. ANDERSON *supra*.

Pursuant to a mandate in the 1784 constitution, a Constitutional Convention was called in 1791 to review the experience under the permanent constitution and recommend any changes. *See* ANDERSON *supra*. This Constitutional Convention resulted in extensive revisions, many of which were adopted by the voters in 1792. In the 1792 constitution, "[t]he compromise position of state President was abolished and the title of Governor was restored, but with sharp restrictions. An Executive Council elected by the people rather than by the Legislature was given negative authority over the Chief Executive, which continues to this day." ANDERSON, *supra* at 106–07. The governor was "detached" from the legislature, except for being given a veto power or "a qualified negative." *See* Letter from William Plumer to Jeremiah Smith, delegates to the 1791 New Hampshire

Constitutional Convention (Dec. 10, 1791) (Microfilm Project, "William Plumer Papers" at New Hampshire Historical Society).

The veto provision adopted in 1792 remains unchanged today. In the current veto provision, there is no phrase, as there was in the 1781 and 1782 drafts, that specifically requires approval of "three quarters of the members present" to override a veto. Instead, the current version states simply that approval is needed by "two-thirds of that house."

It is disputed as to why the delegates chose not to use the phrase "of members present" when referring to the vote necessary to override a veto. The plaintiffs argue that by omitting the phrase from the 1792 constitution, after it had been included in the 1781 and 1782 drafts, the framers must have intended the phrase "two-thirds of that house" to mean two-thirds of the entire elected membership. Although the plaintiffs' argument finds some support in the rules of constitutional construction, *see* C. ANTIEAU, CONSTITUTIONAL CONSTRUCTION § 2.06, at 18–20, § 2.46, at 49–50 (1982), we do not find it to be conclusive. Instead, our review of history and legislative precedent leads us to conclude that the phrase "that house" should be interpreted as those present and voting, a quorum being present.

## C. *Historical Application*

■ Early constitutional interpretation is entitled to great weight in determining the framers' intent, especially when the framers later serve in one of the branches of government. *See Knowlton v. Moore*, 178 U.S. 41, 56 (1900); *see also* ANTIEAU, *supra* § 2.41, at 45–46; *cf. Morin*, 93 N.H. at 47, 35 A.2d at 517 (great weight has always been attached to contemporaneous constructions of constitutional provisions). Several framers of the 1792 constitution later actively participated in the legislative and executive branches. There are two reported veto overrides in which these same individuals interpreted the override provision in article 44 to authorize an override if two-thirds of those voting and present assented.

The first reported veto override occurred on January 16, 1795, only three years after the adoption of article 44. The house and senate each overrode a veto by Governor John Taylor Gilman of a bill relating to mortgage of real estate. *See* N.H.S. JOUR. 75 (1794–95). In each house, the vote to override the veto was greater than two-thirds of those present and voting, but less than two-thirds of the elected membership of each house. Nevertheless, the presiding officer of each house declared that the veto had been overridden. A number of the senators and representatives who participated in the 1795

veto override were delegates to the 1791–92 Constitutional Convention.

A similar precedent occurred on June 26, 1818, when the house overrode a veto by Governor William Plumer by a vote of two-thirds of those present and voting, a quorum being present. *See* N.H.H.R. JOUR. 284–89 (1818). The number of votes in favor of the override did not equal two-thirds of the elected body. *Id.* Prior to serving as Governor, William Plumer was one of the leading delegates at the 1791–92 Constitutional Convention. Had he objected to the house's declaration of an override, it follows that he would have demonstrated his disagreement. The house journal, however, shows no remonstrance by Governor Plumer on this matter. *See id.*

This early interpretation of the words "that house" to mean those present and voting, a quorum being present, is consistent with the sentiment of the framers at the time article 44 was adopted. Having recently shed the shackles of colonial rule, the voters feared the reemergence of a strong executive. Their distrust is evidenced by the text of the 1776 constitution, which centered all the power in the legislature; by the rejection of the 1781 and 1782 constitutions, which gave the executive a powerful veto; and by the elimination of the office of the governor in the 1784 constitution. To give the governor a strong veto power, as the plaintiffs contend, would be incongruous with the historical underpinnings of our State Constitution.

### D. Other State Constitutions

We give weight to the language of comparable clauses in state constitutions upon which the framers relied. *See* ANTIEAU, *supra* § 2.47, at 50. While it is undisputed that the 1781 and 1782 veto provisions were borrowed from the Massachusetts Constitution, it appears that the 1792 version was modeled after the Pennsylvania Constitution. Correspondence between delegates to the 1791 convention reveals that they considered modeling the New Hampshire Constitution after Pennsylvania's Constitution of 1790. *See* Correspondence between William Plumer and Jeremiah Smith, delegates to the 1791 New Hampshire Constitutional Convention (Dec. 10, 1791 to Jan. 20, 1792) (Microfilm Project, "William Plumer Papers" at New Hampshire Historical Society). Further, a comparison of the veto provision of the 1792 constitution with the veto provision in the Pennsylvania Constitution of 1790 shows that the delegates copied the Pennsylvania version with only slight modifications.

The 1790 Pennsylvania veto provision stated that "two-thirds of that house" was needed to override a gubernatorial veto. This pro-

vision appears to be modeled on article I, section 7 of the United States Constitution, which was adopted in 1787. This is significant because the federal veto provision has been interpreted to require only a two-thirds majority of those present and voting to override a presidential veto. *See Missouri Pacific Railway Co. v. Kansas*, 248 U.S. 276, 280 (1919). Although state courts are not bound to interpret their state constitutional provisions the way the United States Supreme Court construes comparable federal constitutional provisions, such precedents are quite persuasive. *See* ANTIEAU, *supra* § 2.48, at 51; *cf. Pollard v. Gregg*, 77 N.H. 190, 192, 90 A. 176, 177 (1914) (giving weight to interpretation of provision in Federal Constitution by the United States House of Representatives when construing similar State constitutional provision). The United States Supreme Court's interpretation of article I, section 7 supports the proposition that the 1790 Pennsylvania veto provision required only two-thirds of those present and voting to override a gubernatorial veto.

◼ This interpretation is supported further by a later amendment made to the Pennsylvania veto provision. In construing amendments, one must read them against the background of the comparable clauses of the original constitution. *See* ANTIEAU, *supra* § 3.14, at 96–97; *cf. Cowan v. Tyrolean Ski Area, Inc.*, 127 N.H. 397, 403, 506 A.2d 690, 694 (1985) (any material change in the language of original legislation is presumed to alter legal rights); *Commonwealth v. Pierce*, 579 A.2d 963, 965 (Pa. Super. 1990), *appeal denied*, 590 A.2d 296 (Pa. 1991) ("A change in the language of a statute ordinarily indicates a change in the legislative intent."). In 1873, the Pennsylvania veto provision was amended to establish a vote of "two-thirds of all the members elected to that house" as the standard for overriding a gubernatorial veto. The inclusion of the words "all the members elected" would have been unnecessary if the 1790 constitution already required a vote of two-thirds of the entire elected body to override a veto.

Because the New Hampshire framers based our veto provision on the 1790 Pennsylvania provision, which in turn was based on the federal provision, we can infer that the framers intended that a vote of only two-thirds of those present and voting was needed to override a gubernatorial veto. *See Bablitch and Bablitch v. Lincoln County*, 82 Wisc. 2d 574, 577, 263 N.W.2d 218, 221 (1978).

*E. Legislative Precedent*

◼ Legislative precedent cannot be ignored as a factor in determining the meaning of the veto override provision. We cite with ap-

proval the following comments by the United States Supreme Court on practical constitutional construction: "General acquiescence cannot justify departure from the law, but long and continuous interpretation in the course of official action under the law may aid in removing doubt as to its meaning." *Smiley v. Holm*, 285 U.S. 355, 369 (1932); *accord Morin*, 93 N.H. at 49, 35 A.2d at 518 (the meaning of the constitution is settled by the continuous and uninterrupted interpretation placed upon it over many years).

Our research reveals that from 1795 to the present, the house overrode a total of forty-four gubernatorial vetoes. Of those, twenty-six were overridden by a vote numbering at least two-thirds of those present and voting, but less than two-thirds of the elected membership. We found no cases in which the veto was sustained because the vote to override reached two-thirds of those present and voting, but did not reach two-thirds of the elected membership. The house consistently has interpreted article 44 to require only two-thirds of those present and voting to attain an override. In 1969, the very question of this appeal was set forth as a parliamentary inquiry. In his response, the speaker of the house said:

> "[I]t does appear that precedent in the past has established that in interpretation of Article 44 of the New Hampshire Constitution to override a veto of the Governor it is necessary only to have two-thirds of the members present and voting.—Providing of course a quorum is present as further prescribed in the constitution."

N.H.H.R. JOUR. 171 (1969). We believe that the house's continuous practice of overriding vetoes based on a vote of two-thirds of those present and voting lends strong support to the house leaders' interpretation.

The senate practice is also relevant to our analysis. Article 44 applies both to the house and the senate. Currently, however, the house and the senate interpret this provision differently. Historically, the senate has followed the same test as the house as to the standard for overriding a gubernatorial veto. There are four precedents dating back to the earliest days of our legislative history in which the presiding officer of the senate stated that the standard for overriding a gubernatorial veto required two-thirds of the senators present. *See* N.H.S. JOUR. 75–76 (1794-95); N.H.S. JOUR. 54–55 (1804); N.H.S. JOUR. 56 (1835); N.H.S. JOUR. 542–43 (1887). Not until June 28, 1971, did the senate's presiding officer offer a different standard in response to a parliamentary inquiry. On that date, the senate chair

stated that "two-thirds of the total membership" of the senate was necessary to override a governor's veto. N.H.S. JOUR. 1937 (1971). This standard again was followed by the senate in 1981. N.H.S. JOUR. 2047 (1981). There are no reasons given in the 1971 and 1981 senate journals explaining this change in interpretation of the veto provision. The plaintiffs argue that the senate's unexplained current practice evidences their claim that the house's unbroken practice for nearly two hundred years should be changed. We are not persuaded. Rather, we believe that the early senate practice is entitled to great weight in determining the framers' intent, see Morin, 93 N.H. at 49, 35 A.2d at 518, and that the more recent senate practice is nothing more than an aberration in constitutional interpretation.

■ For the reasons set forth above, we hold that the phrase "two-thirds of that house" in article 44 means two-thirds of those present and voting, a quorum being present.

### III. Burns v. Arnold

The second question raised in this interlocutory transfer is whether HB 1026 is a "budget bill" under the terms of part II, article 18-a of the New Hampshire Constitution. The attorney general contends that HB 1026 is a budget bill under article 18-a because it is a significant omnibus appropriations bill. As such, any parts of HB 1026 which establish, amend, or repeal non-budgetary statutory law would violate the constitution. The house leaders respond that HB 1026 is not a budget bill because it does not establish a comprehensive financial program with detailed expenditures and sources of funding. For the reasons that follow, we hold that HB 1026 is not a budget bill and, therefore, does not violate article 18-a.

In analyzing article 18-a, we employ the well-established standards of constitutional construction set forth earlier in this opinion. Part II, article 18-a of the New Hampshire Constitution states:

"All sections of all budget bills before the general court shall contain only the operating and capital expenses for the executive, legislative and judicial branches of government. No section or footnote of any such budget bill shall contain any provision which establishes, amends or repeals statutory law, other than provisions establishing, amending or repealing operating and capital expenses for the executive, legislative and judicial branches of government."

Article 18-a was added to the constitution in 1984 in reaction to a growing practice in the legislature of attaching unrelated footnotes

and amendments to the biennial State budget in anticipation of securing a free ride through the legislative process on the budget's coattails. *See Opinion of the Justices*, 126 N.H. at 492–93, 494 A.2d at 265. Attaching a footnote to the budget virtually assured the footnote's passage because of the statutory framework that governs the timing and passage of the State's biennial budget. *See* RSA ch. 9. The Governor is required to transmit a budget for each fiscal year of the upcoming biennium to the legislature by February 15 of the year of each biennial legislative session. RSA 9:2 (1988). The legislature and the Governor then have until the start of the fiscal year on July 1 to agree on an acceptable State budget. *See* RSA 9:13 (1988). Without a budget in place on July 1, much of State government would effectively shut down.

Several delegates to the 1984 Constitutional Convention spoke to the urgency created by an approaching budget deadline and how that urgency effectively made the budget unreviewable in its final stages. After describing the legislative steps through which the budget progresses, one delegate explained: "From the Committee of Conference emerges their suggested budget, usually very late in June, sometimes only a day before June 30. Both Houses must act by June 30. No amendments can be made. None. It is all or nothing." JOURNAL OF CONSTITUTIONAL CONVENTION 303 (1984) (statement of Del. Ahrens). Another delegate concluded that because the budget comes out of the Committee of Conference "at the last minute" on June 29 or 30, "[y]ou cannot amend the budget as proposed no matter how rotten it may be in certain places." *Id.* at 305 (statement of Del. Daniell).

In *Opinion of the Justices*, we acknowledged the concerns behind article 18-a:

"The practice of adding footnotes really began in the early 1970's. Then Governor Thomson exercised the Gubernatorial veto much more frequently than other chief executives, and threatened its use even more often. The result was that legislators who wanted to avoid that veto began attaching their bills as amendments or footnotes to the operating budget. . . . Because the leadership in the House and Senate controlled the Committee of Conference on the budget, the negotiating was done behind closed doors without the input of the non-leadership representatives or the public. The representatives also faced an all or nothing choice when the Conference Committee report came back to the floor at the end of the legislative session."

126 N.H. at 492, 494 A.2d at 265 (quotations omitted).

The knowledge that footnotes and amendments would be enacted along with the budget, virtually without review, created a perverse incentive among legislators to circumvent the standard legislative processes. Proposals completely unrelated to the State budget were added to the budget bill at the eleventh hour without the proper committee review, public hearing, and open floor debate. *See, e.g.*, JOURNAL OF CONSTITUTIONAL CONVENTION 299 (1984) (statement of Del. Phelps); *id.* at 303 (statement of Del. Chase); *id.* at 304 (statement of Del. Dexter). Article 18-a was intended to prevent the State budget from being used to carry numerous unrelated pieces of proposed legislation untouched through the legislative process.

With article 18-a's purpose in mind, we must now determine whether HB 1026 is a budget bill under the terms of the amendment. The only bill subject to the statutory time restraints of RSA chapter 9, and to the corresponding urgency created thereby, is the biennial State budget mandated by RSA 9:2 setting forth the financial program for each of the ensuing fiscal years. The biennial State budget was the focus of all the debate and discussion at the 1984 Constitutional Convention concerning Resolution No. 60, which was to become article 18-a. *See, e.g.*, JOURNAL OF CONSTITUTIONAL CONVENTION 302 (1984) (Del. Jacobson referring to "the Governor's budget bill"); *id.* at 303 (Del. Chase referring to "the Governor's budget" and "the budget"); *id.* (Del. Tamposi noting that "the question at hand relates to footnotes . . . to the capital, or the operating budget"). Even the introductory language of Resolution No. 60 framed the scope of the amendment, stating that it was a resolution "relating to *the* state budget." *Id.* at 299, 309 (emphasis added).

The attorney general argues that the language used in article 18-a referring to "all budget bills" embodies the Constitutional Convention's intent to extend article 18-a's protections beyond the biennial operating and capital budgets. Because HB 1026 is a large, omnibus appropriations bill, the attorney general contends that it is a budget bill and is entitled to the protections of article 18-a. We fail to see how such an inference may be drawn from the words "all budget bills." Referring to budget bills in the plural in no way extends article 18-a's protections to something that is not a budget bill in the basic sense of those words. At oral argument, counsel for the attorney general was understandably uncertain of which bills article 18-a would affect if its protections were to reach beyond the traditional State budget bills. He conceded, and rightly so, that a bill does not automatically become a budget bill simply because it appropriates

money. There is no indication in any of the Constitutional Convention debates over Resolution No. 60 that the amendment was intended to extend beyond the State budget bill to lesser appropriations bills. The words "all budget bills" embody no such intention.

HB 1026 is not the type of bill the Constitutional Convention sought to regulate with article 18-a. HB 1026 is a large, omnibus appropriations bill with sixty-five sections. It appropriates approximately thirteen million dollars and contains sections modifying both the capital and operating budgets as well as existing statutory law. There was, however, no urgency surrounding the passage of HB 1026 as there is with the biennial budget mandated by RSA chapter 9. No overwhelming time pressures caused parts of HB 1026 to go through the process unchecked. The legislative history of HB 1026 makes this clear. The bill as amended by the senate was the subject of a public hearing held by the house appropriations committee and was eventually rejected by a vote on the house floor. Two committees of conference reviewed the bill and held public sessions. Ultimately the Governor vetoed HB 1026. None of the amendments to HB 1026 were added in anticipation of receiving a free ride through the legislative process. Unlike the passage of the biennial State budget, no crisis faced the State upon HB 1026's failure to become law. The legislative history makes it clear that neither the legislature nor the Governor found any parts of HB 1026 to be beyond review.

The attorney general further argues that failing to apply article 18-a to HB 1026 would violate the spirit of the article because it was intended to prohibit non-germane sections from being added to budget bills without having been reviewed by the appropriate legislative policy committees. This argument misconstrues the purposes behind article 18-a. As established above, article 18-a was intended to prevent the State budget from being used to carry numerous, unrelated pieces of proposed legislation through the legislative process. The fact that the budget footnotes did not receive the usual review by policy committees was only a symptom of this abusive practice. Legislators did not add footnotes to the budget hoping to bury them and avoid scrutiny by the policy committees; they wanted to use the budget's coattails to ensure their footnotes would be enacted automatically along with the budget. Article 18-a was not intended to make unconstitutional every change in an appropriations bill after it is released from its assigned policy committee. To apply article 18-a to a bill like HB 1026 solely for this reason would be to create an unworkable legislative process hindered by inflexibility and hostile to compromise.

Finally, we address the attorney general's argument that HB 1026 must be a budget bill because it resembles House Bill 1025, a bill that both parties agree is a budget bill under article 18-a. HB 1025, "an act relative to budget adjustments for fiscal years 1992 and 1993," is what has become known in the legislature as a supplemental budget. *See* Laws 1992, ch. 256 (reprinting HB 1025). The budget required by RSA chapter 9 establishes the State's financial affairs for a biennium. A two-year budget was necessary when the legislature met only in biennial sessions. Since 1984, the legislature has met in annual sessions, *see* N.H. CONST. pt. II, art. 3, and has developed the practice of enacting supplemental capital and operating budgets to make adjustments to the biennial State budget. *See* Laws 1991, ch. 4 (an act relative to state revenue and expenditures); Laws 1990, ch. 1 (an act relative to adjustments to the operating budget for fiscal year 1990 and fiscal year 1991); Laws 1989, ch. 77 (an act making supplemental appropriations for fiscal year 1989).

Although both parties agree that HB 1025 is a budget bill, we need not decide that issue today. Because a supplemental budget is not mandated by statute, as is the biennial State budget, it may not carry with it the same perils of urgency to which article 18-a is directed. HB 1025, however, is similar in content and structure to a biennial budget bill and arguably falls within the language of article 18-a referring to "all budget bills." Assuming that HB 1025 is a budget bill subject to the limitations of article 18-a, we must compare the essential characteristics of HB 1025 and HB 1026 to determine whether HB 1026 would be a budget bill as well. *See Niemiec v. King*, 109 N.H. 586, 587, 258 A.2d 356, 358 (1969); *Opinion of the Justices*, 99 N.H. 528, 530, 114 A.2d 514, 516 (1955).

The essential characteristics of HB 1025 are those of a budget bill in the plain sense of the term. As a supplemental budget bill, HB 1025 adjusts the biennial State budget based on updated information regarding the State's revenues and expenditures and reflects any changes in circumstances that necessitate modification. The bill consists of eighty-six sections, almost all of which deal directly with the biennial budget. It makes modifications across the full range of areas addressed in the biennial budget and constitutes a comprehensive revision of the financial program established for the State.

HB 1026, on the other hand, does not have the content, structure, or essential characteristics to qualify as a budget bill under the plain meaning of article 18-a. Although it is a significant appropriations bill, its primary purpose is not to revise the financial program established by the biennial State budget. Forty of the bill's sixty-five sec-

tions have no fiscal impact. *See* HB 1026, Legislative Budget Assistant's Final Fiscal Note (as amended May 27, 1992). Of the remaining sections, twelve appropriate monies, and the remainder provide for the implementation and funding of those appropriations. *See id.* The essential characteristics of HB 1026 do not make it a budget bill.

■ There is no indication that the legislature in any way has attempted to use HB 1026 as a subterfuge to thwart the purposes of article 18-a. In fact, the legislature's intent appears to be quite the opposite. The legislature created a companion bill to the supplemental budget in the form of HB 1026 to avoid any article 18-a problems that could possibly arise with HB 1025. *See* Senate Floor Debate Transcript at 2 (June 17, 1992) (Sen. Hollingsworth stating "the Constitution did say that we'd no longer have footnotes and that's precisely why 1026 came in"); House Appropriations Committee Hearing Transcript at 52–53 (April 2, 1992) (Mr. Connor explaining that parts of HB 1025 had been switched to HB 1026 to avoid article 18-a violations). For the reasons set forth above, we hold that HB 1026 is not a budget bill and, therefore, does not violate part II, article 18-a of the New Hampshire Constitution.

*Remanded.*

All concurred.