Merrimack
No. 2009-621

# BOARD OF TRUSTEES OF THE NEW HAMPSHIRE JUDICIAL RETIREMENT PLAN & a.

v.

## SECRETARY OF STATE

Argued: April 22, 2010
Opinion Issued: October 27, 2010

*Douglas, Leonard & Garvey, P.C.,* of Concord (*Charles G. Douglas, III* on the brief) and *David M. Howe,* of Concord, by brief, for the plaintiff.

*Michael A. Delaney,* attorney general (*Richard W. Head,* associate attorney general, on the brief and orally), for the defendant.

*Getman, Schulthess & Steere, P.A.,* of Bedford (*Andrew R. Schulman* on the brief and orally), for the intervenor, New Hampshire Retirement System.

DUGGAN, J. The defendant, the Secretary of State (State), appeals an order of the Superior Court (*Nicolosi,* J.) enjoining the enforcement of the Sudan Divestment Act. We reverse and remand.

The record reflects the following facts. The plaintiff, New Hampshire Judicial Retirement Plan (Judicial Plan), and the intervenor, New Hampshire Retirement System (NHRS) (retirement systems, collectively), are "defined pension benefit plans," which invest and manage funds held by the State pursuant to RSA chapter 100-C (Supp. 2009) and RSA chapter 100-A (2001 & Supp. 2009). Each eligible retiree receives a specified benefit set forth by statute. The Judicial Plan is a defined benefit pension trust for all state court judges, *see* RSA 100-C:2, funded by contributions from its members and the State, and earnings on investments. *See* RSA 100-C:13. The NHRS is a defined benefit pension trust for state and political subdivision employees. *See* RSA 100-A:2, :3. It is funded exclusively through member and employer contributions and investment income. RSA

100-A:16 (Supp. 2009). The NHRS trustees have the authority to set the trust's investment strategy, but that authority is accompanied by a strict fiduciary responsibility. *See* RSA 100-A:15, I-a.

In the early 1980s, the legislature borrowed $5,000,000 from the NHRS to finance unrelated state projects. The legislature also set contribution rates for state employees below what was determined by the NHRS trustees to be actuarially required. In response, the 1984 Constitutional Convention proposed Article 36-a to Part I of the New Hampshire Constitution, which the state's voters later approved by a margin of 288,994 to 48,690. Part I, Article 36-a provides:

> The employer contributions certified as payable to the New Hampshire retirement system or any successor system to fund the system's liabilities, as shall be determined by sound actuarial valuation and practice, independent of the executive office, shall be appropriated each fiscal year to the same extent as is certified. All of the assets and proceeds, and income therefrom, of the New Hampshire retirement system and of any and all other retirement systems for public officers and employees operated by the state or by any of its political subdivisions, and of any successor system, and all contributions and payments made to any such system to provide for retirement and related benefits shall be held, invested or disbursed as in trust for the exclusive purpose of providing for such benefits and shall not be encumbered for, or diverted to, any other purposes.

Since 2004, the United States government has recognized that the government of Sudan has engaged in genocide against the non-Arab population in the Darfur region of that country. In 2007, Congress enacted the Sudan Accountability and Divestment Act of 2007 (SADA) "[t]o authorize State and local governments to divest assets in companies that conduct business operations in Sudan." Pub. L. No. 110-174, § 3(b), 121 Stat. 2516, 2518 (2007). Under SADA, a state or local government may divest its assets or prohibit investment of its assets in companies engaged in business with Sudan. *Id.*

In 2008, the New Hampshire General Court, pursuant to this Congressional authorization, enacted RSA chapter 100-D (Supp. 2009), the Sudan Divestment Act (the Act). In enacting the legislation, the General Court made numerous legislative findings, relying upon federal government findings and reports. *See* Laws 2008, 364:1. These findings included that "genocide has occurred and may still be occurring in Darfur," the government of Sudan and its Janjaweed allies had killed an estimated 300,000 to 400,000 people and displaced more than 2,000,000 people from their homes

between 2003-2006, and that "a company's association with sponsors of terrorism and human rights abuses, no matter how large or small . . . can negatively affect the value of an investment." *Id.* Based upon these findings, the General Court concluded that the state's financial resources should not be used to provide support for the Sudanese government, and therefore restricted publicly funded retirement systems from investing public funds or maintaining investments in certain "scrutinized companies" connected with that government. RSA ch. 100-D (Supp. 2009).

The Act, which became effective on July 1, 2008, imposes several requirements upon the retirement systems. First, it requires each retirement system to "make its best efforts to identify all scrutinized companies in which the public fund has direct or indirect holdings or could possibly have such holdings in the future." RSA 100-D:2, I. The Act defines "scrutinized companies" as companies that engage in business operations or contracts with the Sudanese government, that are complicit in the Darfur genocide, or that supply military equipment within Sudan. RSA 100-D:1, XV. Second, the Act requires the trustees to "engage" the "scrutinized companies," inform them of the Act, and notify the companies that the retirement systems will divest their holdings unless the companies cease active business operations in Sudan. RSA 100-D:3, II. Third, the system trustees must implement a divestment process if, after ninety days following the first "engagement" with a "scrutinized company," the company continues to have "scrutinized active business operations." RSA 100-D:3, III(a). Within nine months of a company's identification as "scrutinized," at least fifty percent of the fund's holdings in the company must be divested. RSA 100-D:3, III(a)(1). All of the fund's holdings must be divested within fifteen months. RSA 100-D:3, III(a)(2). Finally, the trustees are prohibited from acquiring securities of "scrutinized companies." RSA 100-D:3, IV. "[I]ndirect holdings in actively managed investment funds" are exempted from the divestment requirement. RSA 100-D:3, VI. Additionally, the Act contains a "safety valve" provision permitting the trustees to cease compliance with the Act if "clear and convincing evidence" shows that divestment is too costly, resulting in at least a half percent diminution of trust assets. RSA 100-D:7.

In September 2008, the Board of Trustees of the Judicial Plan filed a petition for declaratory judgment seeking a ruling that the Act was unconstitutional based upon Article 36-a. The NHRS intervened in November 2008 and moved for preliminary injunctive relief prohibiting enforcement of the Act. In granting the motion, the trial court found that the NHRS had demonstrated a substantial likelihood of success on its argument that Part I, Article 36-a rendered the Act unconstitutional. In July

2009, the trial court approved the parties' stipulation for entry of the injunction as a final order. *See* SUPER. CT. R. 161(b)(2). This appeal followed.

■ We hold that the Act is constitutional based upon: (1) a literal analysis of the text of Part I, Article 36-a of the New Hampshire Constitution; (2) the clear understanding of Part I, Article 36-a by the 1984 Constitutional Convention delegates as evidenced by their statements prior to overwhelmingly approving the amendment; and (3) the clear language of the ballot question describing the scope of Part I, Article 36-a. Accordingly, we reverse.

■ The sole issue on appeal is whether the Act violates Part I, Article 36-a of the New Hampshire Constitution. "Whether or not a statute is constitutional is a question of law, which we review *de novo.*" *Akins v. Sec'y of State*, 154 N.H. 67, 70 (2006). We also review the trial court's interpretation of the constitution *de novo*. *Linehan v. Rockingham County Comm'rs*, 151 N.H. 276, 278 (2004). "In reviewing a legislative act, we presume it to be constitutional and will not declare it invalid except upon inescapable grounds." *Baines v. N.H. Senate President*, 152 N.H. 124, 133 (2005) (quotation omitted). "In other words, we will not hold a statute to be unconstitutional unless a clear and substantial conflict exists between it and the constitution." *Id.* (quotation omitted). As such, a statute will not be construed to be unconstitutional when it is susceptible to a construction rendering it constitutional. *White v. Lee*, 124 N.H. 69, 77-78 (1983). When doubts exist as to the constitutionality of a statute, those doubts must be resolved in favor of its constitutionality. *See Hynes v. Hale*, 146 N.H. 533, 535 (2001); *see also Irish v. Gimbel*, 691 A.2d 664, 669 (Me. 1997). Furthermore, "[t]he wisdom, effectiveness, and economic desirability of a statute is not for us to decide." *Smith Insurance, Inc. v. Grievance Committee*, 120 N.H. 856, 863 (1980).

■ When our inquiry requires us to interpret a provision of the constitution, we must look to its purpose and intent. *Warburton v. Thomas*, 136 N.H. 383, 386-87 (1992). The first resort is the natural significance of the words used by the framers. *Lake County v. Rollins*, 130 U.S. 662, 670 (1889). "The simplest and most obvious interpretation of a constitution, if in itself sensible, is most likely to be that meant by the people in its adoption." *Id.* at 671.

■ "[W]e will give the words in question the meaning they must be presumed to have had to the electorate when the vote was cast." *N.H. Munic. Trust Workers' Comp. Fund v. Flynn, Comm'r*, 133 N.H. 17, 21 (1990) (quotation omitted). "While the constitution as it now stands is to be

considered as a whole as if enacted at one time, to ascertain the meaning of particular expressions it may be necessary to give attention to the circumstances under which they became parts of the instrument." *Attorney General v. Morin*, 93 N.H. 40, 43 (1943) (quotation and citation omitted).

The State argues that Article 36-a simply prohibits the State from diverting retirement assets to fund other state budgetary needs. The retirement systems argue that Article 36-a created a constitutional trust, which requires the systems' trustees to hold and invest trust assets for the exclusive purpose of funding pension benefits for retired workers. The retirement systems further contend that the plain language of Article 36-a prohibits investing or diverting the systems' funds for any other purpose. Accordingly, the retirement systems argue that the Act forces them to divest from investments in scrutinized companies, which they claim conflicts with their constitutional obligations.

The relevant portion of Article 36-a provides: "[All] contributions and payments . . . to provide for retirement and related benefits shall be held, invested or disbursed as in trust for the exclusive purpose of providing for such benefits and shall not be encumbered for, or diverted to, any other purposes."

We have not previously defined the relevant terms within Article 36-a. Webster's dictionary defines "exclusive" as "single or sole." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 793 (unabridged ed. 2002). It defines "purpose" as "something that one sets before himself as an object to be attained: an end or aim to be kept in view in any plan, measure, exertion or operation: DESIGN." *Id.* at 1847. It defines "encumber" as "to load with debts or other legal claims," *id.* at 747, and "divert" as "to turn from one course, direction, objective, or use to another," *id.* at 663. Reading these terms together with the preceding language of the amendment and relying upon the plain meaning of the language used, we conclude that the amendment requires only that retirement system funds be used for the sole object of providing retirement benefits. The Act in question does not require that the systems' funds be used for any purpose other than providing retirement benefits. It simply prohibits one possible investment option. Therefore, the plain meaning of the amendment does not support the retirement systems' interpretation. Nonetheless, to resolve any possible ambiguities, we next turn to the circumstances surrounding the adoption of the amendment to better discern the intent of the people in adopting it.

"[I]t is the duty of the court to place itself as nearly as possible in the situation of the parties at the time the instrument was made, that it may gather their intention from the language used, viewed in the light of the

surrounding circumstances." *Morin*, 93 N.H. at 43 (quotation omitted). We consider a delegate's statements in determining the meaning of an amendment if they interpret the amendment's language "in accordance with its plain and common meaning while being reflective of its known purpose or object." *N.H. Munic. Trust Workers' Comp. Fund*, 133 N.H. at 21.

The 1984 Constitutional Convention occurred in the immediate aftermath of the high-profile diversion of state retirement system assets by the legislature to fund general state revenues during a budget crisis. *See* JOURNAL OF THE CONSTITUTIONAL CONVENTION 263-65 (1984); Donn Tibbetts, *Sununu Denies Money Taken from Fund, The Union Leader*, Oct. 14, 1983, at 5. Delegates sought a constitutional amendment to prevent the legislature or Governor from taking similar action in the future. *See* JOURNAL OF THE CONSTITUTIONAL CONVENTION, *supra* at 261 (Delegate Ramsey). During the debate regarding the amendment, delegates repeatedly emphasized the need to prevent the legislature from diverting money from the retirement system to fund other government operations and keep the retirement system solvent. As Delegate King stated:

> As well publicized, the budget concerns that happen every two years . . . it becomes budget desperation when you're looking to balance the budget. You need a few millions dollars, well, we'll just adjust some projections, and short-fund the retirement system and take six million dollars, and spend it some place else, and that's exactly what happened in this past session of the legislature.

JOURNAL OF THE CONSTITUTIONAL CONVENTION, *supra* at 263 (Delegate King). Additionally, Delegate Greenwood stated:

> When the state legislature did their budget process last time, I had forty-five employees call, wanting to know if their retirement system was going down the tubes. That is the concern. You have, as legislators, as employers, made a contract with your employees. You have said that you will pay to their retirement system, not when it feels good, and not after everything else, but before. . . . I pay my share, my municipality pays its share, the state employees pay their share. They have no choice. The state needs to have no choice in paying its share.

JOURNAL OF THE CONSTITUTIONAL CONVENTION, *supra* at 263-64 (Delegate Greenwood). These statements provide strong support for the conclusion that the delegates sought only to prohibit the legislature from allocating retirement system funds to other areas. Indeed, the debate was

devoid of any reference to constitutionalizing a trustee's common law fiduciary duty or creating a constitutional trust.

■ Additional support for this conclusion is found in the language of the ballot question presented to the voters, which asked:

> Are you in favor of amending the constitution to provide that all the assets of both the New Hampshire retirement system and any other retirement system for public officers and employees operated by the state or its political subdivisions *shall be used exclusively for the benefit of any such retirement system and shall not be diverted or used for any other purpose,* and that the New Hampshire retirement system or any successor system shall be fully funded each fiscal year as determined by sound actuarial valuation and practice?

JOURNAL OF THE CONSTITUTIONAL CONVENTION, *supra* at 378 (emphasis added). While the retirement systems place great emphasis on the phrases "held, invested or disbursed as in trust" and "exclusive purpose" in Article 36-a, neither phrase was included in the ballot question to the voters. The plain language of the ballot question simply shows an intent to ensure that the State cannot use retirement system assets to fund other State operations. These were the words facing the voters on the ballot when they overwhelmingly approved the amendment. The plain meaning of the ballot question taken together with the events surrounding the adoption of the amendment and the statements of many of the delegates at the constitutional convention make clear that the voters contemplated only the problem of the day — that is, the use of retirement system assets to fund other state operations. Accordingly, we hold that Article 36-a is not inconsistent with the Sudan Divestment Act because it does not prevent the retirement systems from using their assets for the exclusive purpose of providing retirement benefits.

The retirement systems also argue that Article 36-a broadly prohibits any action not in the best interests of the retirement funds. In particular, as noted above, they place significant emphasis upon the phrases "in trust" and "exclusive purpose." The Judicial Plan argues that the use of the words "in trust" evidences an intent to create a constitutional trust with respect to the retirement systems' funds, giving rise to constitutional fiduciary duties based upon the common law of trusts. Additionally, the NHRS argues that the words "exclusive purpose" refer directly to a trustee's common law fiduciary duty, later codified by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001-1191c (2006), and RSA 100-A:15.

Under the law of trusts, the duty of loyalty is " '[t]he most fundamental duty owed[.] [It is] the duty of a trustee to administer the trust solely in the interest of the beneficiaries.' " *In re Baylis*, 313 F.3d 9, 20 (1st Cir. 2002) (brackets, quotations and ellipses omitted) (quoting 2A A. SCOTT, THE LAW OF TRUSTS § 170 (W.F. Fratcher ed., 4th ed. 2001)); *see also* RESTATEMENT (THIRD) OF TRUSTS § 78(1) (2007) ("a trustee has a duty to administer the trust *solely in the interest* of the beneficiaries" (emphasis added)). Additionally, as the NHRS correctly points out, the fiduciary duties imposed by ERISA draw much of their content from the common law of trusts. *Varity Corp. v. Howe*, 516 U.S. 489, 496 (1996). ERISA requires that private plan trustees act "solely in the interest of the participants and beneficiaries and for the *exclusive purpose* of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A) (2006) (emphasis added). RSA 100-A:15 provides that "[a] trustee . . . shall discharge duties with respect to the retirement system: (1) [s]*olely in the interest* of the participants and beneficiaries; [and] (2) [f]or the *exclusive purpose* of providing benefits to participants and beneficiaries . . . ." (Emphasis added.) Therefore, the retirement systems contend that "one can only conclude that Article 36-A was written to constitutionalize the exclusive purpose doctrine." They claim that the exclusive purpose doctrine, as adopted in Article 36-a, prohibits the plan trustees from taking any action that does not benefit the plan beneficiaries, including divesting the retirement systems' investments in scrutinized companies in Sudan.

This interpretation construes Article 36-a in a way that is incompatible with its plain meaning and unlikely to have been commonly understood by the electorate. *See N.H. Munic. Trust Workers' Comp. Fund*, 133 N.H. at 21. The NHRS claims that prior to the 1984 Constitutional Convention, significant public attention was focused upon numerous abuses involving public pension plans. These well-publicized breaches, they contend, both led to the creation of ERISA and drew voters' attention to how their retirement funds were managed. Therefore, NHRS argues, the electorate likely knew of the exclusive purpose doctrine and deliberately adopted those words in an attempt to constitutionalize it.

█ As an initial matter, given the wording of the ballot question, it is highly unlikely that the voters knew of or sought to incorporate an ERISA or common law standard into the New Hampshire Constitution. *See Lake County*, 130 U.S. at 671 (warning against the application of complex rules of statutory interpretation because voters are unlikely versed in "the niceties of construction"). Moreover, the retirement systems' interpretation goes beyond the plain meaning of the words in the amendment and

certainly does not comport with the simplest and most obvious interpretation of the words used. *See id.* Therefore, the interpretation offered by the retirement systems is contrary to the plain meaning of Article 36-a.

Finally, the State addresses the trustees' statutory fiduciary duties and argues that the Act "does not affect, but is consistent with, the fiduciary duty of loyalty assigned to Trustees in RSA 100-A:15." The NHRS addresses this claim only in passing. The trial court found on a preliminary basis that the trustees could not comply with the Act without violating their common law fiduciary duties. However, the court declined to decide what standard to apply in determining whether a trustee who complies with the Act has met his fiduciary duties and appears to have retreated from its preliminary ruling. Given the absence of a definitive ruling and the NHRS' failure to address it, we remand the case to the trial court to determine whether the Act impermissibly interferes with the trustees' statutory or common law fiduciary duties. *See* RSA 100-A:15.

*Reversed and remanded.*

BRODERICK, C.J., and DALIANIS, HICKS and CONBOY, JJ., concurred.