NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

## THE SUPREME COURT OF NEW HAMPSHIRE

———————————————

Request of the House of Representatives
No. 2020-0414

OPINION OF THE JUSTICES
(Quorum under Part II, Article 20)

Argued: October 29, 2020
Opinion Issued: November 17, 2020

On September 17, 2020, the clerk of the New Hampshire House of Representatives notified the associate justices of the supreme court that a "request for an opinion of the justices pursuant to Part II, Article 74 of the New Hampshire Constitution was adopted by the House of Representatives on September 16, 2020" upon the following question of law: "Would holding a session of the New Hampshire House of Representatives remotely, either wholly or in part, whereby a quorum could be determined electronically, violate Part II, Article 20 of the New Hampshire Constitution?"

Upon receipt of the request, we invited "any legislator, attorney, organization, interested party, or member of the public" to submit memoranda addressing the above question. Upon receipt of those memoranda, we asked each party submitting a memorandum to notify the court in writing whether the party requested oral argument. Oral argument was held on October 29, 2020.

<u>To the Honorable House:</u>

Having considered the oral and written submissions we received, the following response is respectfully returned:

The House has asked a single question: whether holding a House session remotely, either wholly or in part, whereby a quorum could be determined electronically, would violate Part II, Article 20 of the New Hampshire Constitution. We answer this question in the negative.

Before explaining our answer, we address two preliminary issues. First, we observe that our advisory duty under Part II, Article 74 does not ordinarily require us "to furnish an opinion when the question submitted is not pending and awaiting action in the body propounding the inquiry." Opinion of the Justices, 93 N.H. 474, 475 (1944). "It is our conviction, however, that the reasons which require adherence to this rule do not exist in the present instance." Id. Here, an "unforeseeable emergency" caused by the COVID-19 pandemic resulted in the House conducting business remotely. Id. (quotation omitted); see The General Court of New Hampshire, http://www.gencourt.state.nh.us (last visited Nov. 16, 2020) (stating that "[d]ue to the COVID-19 pandemic, the General Court is conducting legislative activities remotely with the exception of publicly noticed sessions in the House or Senate Calendar"); see also Exec. Order No. 2020-04 (March 13, 2020) (Governor's declaration of a state of emergency due to COVID-19); Exec. Order No. 2020-21 (October 30, 2020) (extending the state of emergency declared in executive order number 2020-04 through November 20, 2020).

Moreover, the question propounded in this matter "relates to the constitutional authority of the [House] itself," and, thus, "may be of use to the present Legislature in the performance of its official duty." Opinion of the Justices, 93 N.H. at 475. In answering the House's question, "we do not intend to depart from the settled interpretation of [Part II, Article 74] of the Constitution or to set a precedent for future advisory opinions." Opinion of the Justices, 105 N.H. 125, 127 (1963).

Second, we note that two private individuals ask us to consider whether holding House sessions remotely, either wholly or in part, whereby a quorum could be determined electronically, would violate Part I, Articles 8 and 31 and Part II, Articles 3, 8, and 21 of the State Constitution. We decline to answer their question for the following reasons.

As we have often noted, Part II, Article 74 "empowers the justices of the supreme court to render advisory opinions, outside the context of concrete, fully-developed factual situations and without the benefit of adversary legal presentations, only in carefully circumscribed situations." Opinion of the Justices (Appointment of Chief Justice), 150 N.H. 355, 356 (2003). "The bodies authorized to . . . obtain [advisory] opinions are limited by [Part II, Article 74] to the branches of the Legislature and the Governor and Council." Piper v. Meredith, 109 N.H. 328, 330 (1969). Part II, Article 74 does not authorize the

2

justices to render advisory opinions to private individuals. Id. Nor does "the constitutional duty of the justices of the supreme court to give advisory opinions . . . include answering legal questions that require resolving questions of fact." Opinion of the Justices (Domicile for Voting Purposes), 167 N.H. 539, 542 (2015).

Moreover, as justices have previously explained, it is not "within our province to speculate upon whether other constitutional issues might be raised." Opinion of the Justices, 101 N.H. 518, 522-23 (1957); see Opinion of the Justices, 131 N.H. 583, 590 (1989). Nonetheless, we observe that, at oral argument, although the attorney arguing in support of an affirmative answer to the question presented expressed concern that remote House sessions diminish public access to legislative proceedings, attorneys arguing in support of a negative answer to the question countered that remote House sessions may actually enhance such access.

We turn now to the question the House has asked us to answer. Part II, Article 20 of the New Hampshire Constitution provides: "A majority of the members of the house of representatives shall be a quorum for doing business: But when less than two-thirds of the representatives elected shall be present, the assent of two-thirds of those members shall be necessary to render their acts and proceedings valid."

"When our inquiry requires us to interpret a provision of the constitution, we must look to its purpose and intent." Bd. of Trustees, N.H. Judicial Ret. Plan v. Sec'y of State, 161 N.H. 49, 53 (2010). We first look to the natural significance of the words used by the framers. Id. "The simplest and most obvious interpretation of a constitution, if in itself sensible, is most likely to be that meant by the people in its adoption." Id. (quotation omitted). "While the constitution as it now stands is to be considered as a whole as if enacted at one time, to ascertain the meaning of particular expressions it may be necessary to give attention to the circumstances under which they became parts of the instrument." Id. at 53-54 (quotation omitted). "By reviewing the history of the constitution and its amendments, the court endeavors to place itself as nearly as possible in the situation of the parties at the time the instrument was made, that it may gather their intention from the language used, viewed in the light of the surrounding circumstances." Baines v. N.H. Senate President, 152 N.H. 124, 133 (2005) (quotation omitted).

The language of Part II, Article 20 has been a part of the New Hampshire Constitution since 1784. See 6 Sources and Documents of U.S. Constitutions 344, 351 (William F. Swindler ed., 1976). New Hampshire adopted its first constitution in 1776, after the State became independent of British rule.

3

Warburton v. Thomas, 136 N.H. 383, 388 (1992). The New Hampshire Constitution of 1776 "was the first written constitution adopted in America by any of the colonies." Manual of the Constitutional Convention of 1918 61 (1918).

The first constitution vested all governing power in the legislature and provided for neither a governor nor an independent judiciary. Warburton, 136 N.H. at 388. It also did not include a provision regarding the quorum of the house of representatives required to do business. See 6 Sources and Documents of U.S. Constitutions, supra at 342-43. This temporary constitution continued in force until 1784 when a permanent constitution was approved. Warburton, 136 N.H. at 388; 6 Sources and Documents of U.S. Constitutions, supra at 357.

In 1778, a second constitutional convention was held and, although it produced a revised constitution, that constitution was rejected by the citizenry. W. F. Dodd, The First State Constitutional Conventions, 1776-1783, 2 The Am. Pol. Sci. Rev. 545, 548-49 (1908). The 1778 constitutional convention voted, after a long debate, "that there should be a bi-cameral legislature," consisting of a "Council" and a "House of Representatives." Manual of the Constitutional Convention of 1918, supra at 64. "The 1778 convention produced a document saying only Protestants could vote, a person had to possess 300 pounds to sit in the Legislature, and centered all state authority within its two branches." Leon W. Anderson, A History of the New Hampshire Constitution 1 in The Constitution of New Hampshire (Office of Sec'y of State of N.H. 1973). However, the 1778 constitution did contain a quorum clause, as follows: "A quorum of the council and a quorum of the house of representatives shall consist of a majority of each house." Manual of the Constitutional Convention of 1918, supra at 68.

Another constitutional convention began in 1781 and "continued in existence for over two years." James Fairbanks Colby, Manual of the Constitution of the State of New Hampshire 46 (1902). During that time, "two constitutions were framed, submitted to the people, and rejected," before a third proposed constitution was recommended and approved by the citizenry, effective June 1784. Id. "Unfortunately the journal of this convention was not preserved, and consequently the records of its proceedings are very meager." Id. at 91.

Under the draft 1781 constitution, the legislature was to include a 50-member house, apportioned by county. Manual of the Constitutional Convention of 1918, supra at 71; N.H. CONST. pt. II (proposed 1781). The proposed constitution provided that two-thirds of the members of the house

4

"elected, provided the said two thirds do not amount to a less number than thirty, shall make a quorum for doing business." N.H. CONST. pt. II (proposed 1781). The address to the citizenry from the convention explaining the draft constitution did not mention the quorum provision. See Colby, supra at 99-109. After the 1781 draft was rejected, the convention reconvened to revise the draft. Manual of the Constitutional Convention of 1918, supra at 77. The 1782 draft "made the size of the house variable instead of fixed at 50." Manual of the Constitutional Convention of 1918, supra at 77.

The permanent constitution ultimately approved by the citizenry, which became effective in 1784, did not limit the number of the members of the house of representatives, and included the quorum clause as it exists today. 6 Sources and Documents of U.S. Constitutions, supra at 350-51. "Pursuant to a mandate in the 1784 constitution, a Constitutional Convention was called in 1791 to review the experience under the permanent constitution and recommend any changes." Warburton, 136 N.H. at 389. No changes were recommended or made to the language of the quorum clause. See Manual of the Constitutional Convention of 1918, supra at 97, 102-03, 113-16; see also N.H. CONST. pt. II, art. 20 (1792).

The language of the first clause of Part II, Article 20 ("A majority of the members of the house of representatives shall be a quorum for doing business") is nearly identical to that found in the Federal Quorum Clause. The Federal Quorum Clause provides:

> Each house shall be the judge of the elections, returns and qualifications of its own members, and a majority of each shall constitute a quorum to do business; but a smaller number may adjourn from day to day, and may be authorized to compel the attendance of absent members, in such manner and under such penalties as each house may provide.

U.S. CONST. art. I, § 5, cl. 1 (emphasis added). Because of the similarity in language, we find the history of the Federal Quorum Clause, adopted in 1787, after the first permanent New Hampshire Constitution was adopted, instructive. See 2 The Records of the Federal Convention of 1787 592 (Max Farrand ed., 1911); see also Baines, 152 N.H. at 134-35 (examining the history of the Federal Origination Clause when interpreting the origination clause in the State Constitution); Pollard v. Gregg, 77 N.H. 190, 192 (1914) (giving weight to federal interpretation of the Federal Quorum Clause when interpreting Quorum Clause of the State Constitution), superseded by statute on other grounds as stated in In re Juvenile 2005-212, 154 N.H. 763, 767 (2007).

The language of the Federal Quorum Clause, Article 1, Section 5, Clause 1 of the Federal Constitution, was settled in September 1787. See 2 The

Records of the Federal Convention of 1787, supra at 592; see also John Bryan Williams, How to Survive a Terrorist Attack: The Constitution's Majority Quorum Requirement and the Continuity of Congress, 48 Wm. & Mary L. Rev. 1025, 1041 (2006). "By the time of the 1787 Convention, the legislative bodies of the thirteen states generally operated under majority quorum requirements." Williams, supra at 1038 n.36. "When the Committee [of Detail] reported back to the Convention on August 6th with a draft based on the Convention's earlier debates, it included a section in Article VI establishing that a majority of members of each House constituted a quorum to do business." Williams, supra at 1037; see 2 The Records of the Federal Convention of 1787, supra at 179-80. "The Convention had not debated the issue before this time, so it appears that the members of the Committee [of Detail], as they did in other sections, took this language from contemporary state constitutions." Williams, supra at 1037-38.

"The Constitutional Convention considered several different quorum rules, debating in some detail how the different schemes would affect the representative bodies they sought to create." Williams, supra at 1046. "One of the central themes of the debate over the quorum requirement concerned the logistical difficulties and delays contemporary legislatures had in assembling a majority of their members." Williams, supra at 1038. "Many delegates feared that a high quorum requirement in a national legislature would be an insurmountable obstacle to the efficient conduct of business." Williams, supra at 1038; see 2 The Records of the Federal Convention of 1787, supra at 251. The convention had experienced this itself. See Williams, supra at 1038 n.37. When it opened on May 14, 1787, only two complete state delegations were present. Williams, supra at 1038. The convention could not convene for business until 11 days later when the seventh state delegation arrived. Williams, supra at 1038.

"The proponents of a lower quorum requirement made another argument: that a majority quorum requirement might be high enough to encourage members of Congress to engage in quorum-busting maneuvers (what they called 'secessions')." Williams, supra at 1039. "Their argument was that if a house had once reached a majority to do business, but many members were still absent, a minority group large enough to deprive the house of a majority could hold the Congress hostage by threatening secession." Williams, supra at 1039; see 2 The Records of the Federal Convention of 1787, supra at 251-52. "In response to these concerns over the high potential costs of a majority requirement, several delegates proposed setting a baseline quorum number in the Constitution, but then giving the houses discretion to later adjust the quorum number through legislation." Williams, supra at 1039.

However, "[t]he majority of delegates . . . favored a constitutionally fixed majority quorum requirement, arguing that, in spite of the higher costs it

imposed on the decision-making process, it provided Americans a guarantee that a small group of unrepresentative people could not take actions binding the whole country." Williams, supra at 1040; see 2 The Records of the Federal Convention of 1787, supra at 251-52. A delegate from Virginia argued that in a country "embracing so great a diversity of interests, it would be dangerous to the distant parts to allow a small number of members of the two Houses to make laws." 2 The Records of the Federal Convention of 1787, supra at 121, 251-52; see 1 The Records of the Federal Convention of 1787, at 1 (Max Farrand ed., 1911) (identifying delegates from Virginia). He cautioned that "[i]f the Legislature should be able to reduce the number at all, it might reduce it as low as it pleased & the U. States might be governed by a Juncto . . . ."[1] 2 The Records of the Federal Convention of 1787, supra at 252. Thus, "the convention rejected the English Parliament model of a numerically small quorum, which would reduce the costs of doing business, but would not provide what [the framers] thought was an adequate representational guarantee." Williams, supra at 1046.

As this history reveals, the framers of the Federal Constitution intended the majority quorum requirement to ensure that legislation would not pass with "too small a number to represent the whole inhabitants of the United States," 5 Debates on the Adoption of the Federal Constitution in the Convention 292-93 (Jonathan Elliot ed. 1845), and to guarantee that congressional members residing far from the seat of government would not be excluded from its work, 2 The Records of the Federal Convention of 1787, supra at 251-52.

As the United States Supreme Court has explained when discussing the Federal Quorum Clause:

> The two houses of Congress are legislative bodies representing larger constituencies. Power is not vested in any one individual, but in the aggregate of the members who compose the body, and its action is not the action of any separate member or number of members, but the action of the body as a whole; and the question which has over and over again been raised is, what is necessary to constitute the official action of this legislative and representative body.

United States v. Ballin, 144 U.S. 1, 7 (1892).

---

[1] According to a dictionary of the time, "juncto" had the same meaning as "junto," and both words referred to "a company of conspirators, or a factious assembly of [malcontents], met together either to exercise that authority, which their rebellion has put into their power, or to consult of ways and means of carrying on and supporting their present and future designs." N. Bailey, The New Universal Etymological English Dictionary (7th ed. 1776).

Justices of this court have similarly explained with respect to Part II, Article 20:

> The State Constitution . . . provides that neither the house of representatives, nor the senate may act in the absence of a specified quorum.  Left unstated, yet implicit in this constitutional scheme, is the requirement that the legislative authority of the government may be exercised only by a quorum of the two bodies of the General Court.  Although the legislature may delegate a portion of the legislative authority to an administrative agency which is not subject to this requirement, it may not delegate its lawmaking authority to a smaller legislative body and thereby evade the requirement for action by a majority of a quorum of both legislative bodies.

Opinion of the Justices, 121 N.H. 552, 560 (1981) (citation omitted).

The evident principal aim of the majority quorum requirement in the first clause of Part II, Article 20, and the two-thirds quorum requirement in the second clause, "is to ensure that a certain number of members are present" before the House "can transact business."  Williams, supra at 1032; see Ballin, 144 U.S. at 5 (explaining that under the Federal Quorum Clause, "when a majority are present the house is in a position to do business[;] [i]ts capacity to transact business is then established"); see also 2 Samuel Johnson, A Dictionary of the English Language (4th ed. 1773) (defining a "quorum" as "such a number of any officers as is sufficient to do business").

Within the meaning of Part II, Article 20, "present" means "[n]ot absent ; being face to face ; being at hand."  2 Samuel Johnson, A Dictionary of the English Language, supra.  As a practical matter in the eighteenth century, physical presence was required for there to be a quorum, and because of distance and travel, it could take time for a quorum to be present.  For instance, although Congress met for the first time on March 4, 1789, both houses had to adjourn because neither had a quorum on that date.  Howard M. Wasserman, The Trouble with Shadow Government, 52 Emory L.J. 281, 301 (2003).  Over the next month, both houses of the federal legislature had to adjourn repeatedly because of the lack of a quorum.  Id. at 301-02.  The House did not achieve a quorum until April 1, and the Senate did not achieve a quorum until April 6.  Id. at 302.

"We may assume" that the framers of the State Constitution, in adopting Part II, Article 20, "did not have specifically in mind" virtual presence "any more than [the framers of the Federal Constitution] contemplated the

application of the commerce clause to interstate telephone, telegraph and wireless communication, which are concededly within it." <u>Tashjian v. Republican Party of Connecticut</u>, 479 U.S. 208, 226 (1986) (quotation omitted) (recognizing that the framers of the Federal Constitution, in adopting the Qualifications Clause, were "not contemplating the effects of that provision upon the modern system of party primaries"); <u>see</u> <u>Kyllo v. United States</u>, 533 U.S. 27, 29, 33-34 (2001) (writing for the court, Justice Scalia observed that "[i]t would be foolish to contend that the degree of privacy secured to citizens by the Fourth Amendment has been entirely unaffected by the advance of technology").

"But in determining whether a provision of the Constitution applies to a new subject matter, it is of little significance that it is one with which the framers were not familiar." <u>Tashjian</u>, 479 U.S. at 226 (quotation omitted); <u>see</u> <u>Lopez v. United States</u>, 373 U.S. 427, 459 (1963) (Brennan, J., dissenting) ("The Constitution would be an utterly impractical instrument of contemporary government if it were deemed to reach only problems familiar to the technology of the eighteenth century . . . ."). "For in setting up an enduring framework of government they undertook to carry out for the indefinite future and in all the vicissitudes of the changing affairs of [the citizenry], those fundamental purposes which the instrument itself discloses." <u>Tashjian</u>, 479 U.S. at 226 (quotation omitted); <u>cf</u>. <u>The Federalist No. 59</u>, at 306 (Alexander Hamilton) (George W. Carey and James McClellan eds., 2001) ("It will not be alleged, that an election law could have been framed and inserted in the constitution, which would have been applicable to every probable change in the situation of the country.").

As long as the requisite number of representatives is "present," either in person or virtually, meaning that the requisite number is "at hand" and "[n]ot absent," Part II, Article 20 is satisfied. 2 Samuel Johnson, <u>A Dictionary of the English Language</u>, <u>supra</u>; <u>see</u> <u>Pollard</u>, 77 N.H. at 192 (holding that the phrase "members of the house of representatives" in the first clause of Part II, Article 20 "refers to those members elected who are qualified and recognized as constituting the body of the house for the transaction of business, and does not include deceased persons, or persons who have resigned, or who have been removed since their election as representatives"). Moreover, the State Constitution, like the Federal Constitution, "prescribe[s] no method" for determining whether a quorum is present. <u>Ballin</u>, 144 U.S. at 6. The State Constitution, like the Federal Constitution, commits to each house of the legislature the authority to adopt its own rules of proceedings. <u>See</u> N.H. CONST. pt. II, art. 22; U.S. CONST. art. I, § 5, cl. 2. Thus, "it is . . . within the competency of the house to prescribe any method which shall be reasonably certain to ascertain" the presence of a quorum. <u>Ballin</u>, 144 U.S. at 6.

9

For all of the above reasons, we conclude that holding a House session remotely, either wholly or in part, whereby a quorum could be determined electronically, would not violate Part II, Article 20 of the New Hampshire Constitution.

_____
GARY E. HICKS
Senior Associate Justice

_____
JAMES P. BASSETT
Associate Justice

_____
ANNA BARBARA HANTZ MARCONI
Associate Justice

_____
PATRICK E. DONOVAN
Associate Justice

James S. Cianci, house legal counsel, filed a memorandum and argued orally on behalf of the New Hampshire House of Representatives in support of a negative answer to the question presented.

Ian R. A. Oxenham, of Plainfield, filed a memorandum and argued orally on behalf of Representative Lee Oxenham of the New Hampshire House of Representatives in support of a negative answer to the question presented.

Paul Twomey, of Epsom, filed a memorandum and argued orally on behalf of Representative Robert "Renny" Cushing and former Representative Mindi Messmer of the New Hampshire House of Representatives in support of a negative answer to the question presented.

Representative David R. Coursin, MD, of Northwood, of the New Hampshire House of Representatives, filed a memorandum in support of a negative answer to the question presented.

Joseph A. Hoell, Jr., of Milford, Secretary, The New Hampshire Firearms Coalition Inc., filed a memorandum in support of an affirmative answer to the question presented, and Penny S. Dean, of Concord, argued orally on his behalf.

Andrew J. Manuse, Chairman ReOpenNH, joined in the memorandum submitted by Joseph A. Hoell, Jr.